## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| HILLARY FRENCH, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION |
| RADIUS GLOBAL SOLUTIONS LLC, | JURY TRIAL DEMANDED |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Hillary French ("Plaintiff"), individually and on behalf of all others similarly situated (collectively "Class Members"), by and through her attorneys, brings this Class Action Complaint against Radius Global Solutions LLC ("Defendant" or "Radius"), and alleges, upon personal knowledge as to her own actions and her counsel's investigations, and upon information and belief as to all other matters.

## INTRODUCTION

1.    Plaintiff brings this class action against Radius for its failure to secure and safeguard the personally identifiable information ("PII") and personal health information ("PHI") of approximately 600,794 people.

2.    Radius is an entity that provides various customer service solutions to businesses across a number of different industries, including those specializing in accounts receivable, customer service outsourcing, delinquency management, and sales and market

1

research.[1] It has more than 4,000 employees across 14 locations.[2] In the course of its operations, Radius is entrusted with peoples' sensitive PII and PHI.

3.      On August 4, 2023, Radius announced that it had "learned of a vulnerability in the MOVEit web transfer application" which it uses "for transferring documents" (hereinafter the "Data Breach").[3] Radius' notice indicated that it had first become aware of the Data Breach on June 1, 2023.

4.      The harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

5.      As a customer service provider, Radius knowingly obtains sensitive patient PII and PHI and has a resulting duty to securely maintain such information in confidence. Radius owed a non-delegable duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their

---

[1] What we do, RADIUS, https://www.radiusgs.com/what-we-do/ (last visited Sept. 26, 2023).

[2] About us, RADIUS, https://www.radiusgs.com/about-us/ (last visited Sept. 26, 2023).

[3] *Notice of MoveIt Data Event*, https://www.radiusgs.com/wp-content/uploads/2023/08/Radius_Envision-Website_Notice.pdf

PII/PHI against unauthorized access and disclosure. It also had an obligation to ensure that any vendor or third party it selected to offload the sensitive information it was entrusted with would take reasonable measures to safeguard that data.

6.      Based on the public statements of Radius to date, a wide variety of PII and PHI was implicated in the Data Breach, including names, birthdates, Social Security numbers, as well as "patient treatment codes," treatment location, and treatment payment history.

7.      Unlike financial information, such as credit card and bank account numbers, the PHI and certain PII exfiltrated in the Data Breach cannot be easily changed.  Dates of birth and Social Security numbers are given at birth and attach to a person for the duration of his or her life.  For these reasons, these types of information are among the most lucrative and valuable to hackers.

8.      As a direct and proximate result of Radius' failure to adequately safeguard the sensitive data entrusted to it (and failure to abide by its own Privacy Policy) Plaintiff's and Class Members' PII and PHI has been accessed by "unauthorized actors."[4]

9.      Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Indeed, Plaintiff has already been subject to attempted identity theft. Consequently, Plaintiff and Class Members must devote

---

[4] *Notice of MoveIt Data Event.*

substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

10. Plaintiff, on behalf of herself and the Class as defined herein, bring claims for negligence, negligence *per se*, breach of fiduciary duty, breach of an implied contract, breach of contracts to which Plaintiff is an intended third party beneficiary and, in the alternative, unjust enrichment.

## PARTIES

### Plaintiff

11. Plaintiff Hillary French is a resident of Denver, Colorado.

### Defendant

12. Defendant Radius Global Solutions LLC is a Minnesota limited liability company headquartered at 7831 Glenroy, Suite 250, Edina, Minnesota 55439.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists as Radius is a citizen of a state different from that of at least one Class Member. Plaintiff is a resident of Colorado. Defendant is a resident of the state of Minnesota by virtue of having their principal places of business located in Minnesota.

14. This Court has personal jurisdiction over Radius because it is a resident of the State of Minnesota.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the conduct alleged herein occurred in, were directed to, and/or emanated from this District. Venue is additionally proper because Radius transacts business and may be found in this District.

## FACTUAL BACKGROUND

**A.    Radius and the Services it Provides.**

16.     Radius is a customer service and engagement specialist. The company handles customer retention, call center management, and other business process outsourcing for its clients.

17.     In the course of its operations, Radius comes into the possession of the highly sensitive PII and PHI of Plaintiff and Class Members. Plaintiff and Class Members entrusted this information to Radius with the reasonable expectation and mutual understanding that it would comply with its obligations to keep such information confidential and secure from unauthorized access.

18.     Indeed, Radius contains a comprehensive Notice of Privacy Practices that acknowledges its obligations to keep Plaintiff and Class Members' PII and PHI confidential and secure from unauthorized access. The notice states:

- "We have implemented physical, electronic, and procedural security safeguards to protect against the unauthorized or unlawful release of or access to personal information, including any social security numbers."

- "To further safeguard this information, access to sensitive information such as social security numbers is limited, and our employees must abide by standards of conduct and confidentiality agreements."

- "We store Personal Information in a database on computers or servers owned or accessed by us. These computers and servers have security measures (such as a firewall) in place to protect against the loss, misuse, and alteration of the information under our control. Data transmitted through our website, including Personal Information you submit, is protected using 1024-bit encrypted Secure Socket Layer (SSL) technology to make your connection to our server completely confidential."

- "The data you provide is immediately translated into code and can only be decoded by us."[5]

19.    By obtaining, collecting, and storing Plaintiff and Class Members' PII and PHI, Radius assumed legal and equitable duties and knew or should have known that Defendant was responsible for protecting Plaintiff's and Class Members PII and PHI from unauthorized disclosure.

20.    Radius nevertheless employed inadequate data security measures to protect and secure the PII and PHI clients entrusted to it, resulting in the Data Breach and compromise of Plaintiff's and Class Members' PII and PHI. Companies entrusted Radius with their sensitive data of PII, resulting in the Data Breach and compromise of Plaintiff's and Class Members' PII and PHI.

**B.    Radius Knew the Risks of Storing Valuable PII and PHI and the Foreseeable Harm to its Clients.**

21.    At all relevant times, Defendant knew it was storing sensitive PII and PHI and that, as a result, its systems would be an attractive target for cybercriminals.

22.    Defendant also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud

---

[5] Privacy Policy, RADIUSGS, https://www.radiusgs.com/privacy-policy/ (last visited Sept. 26, 2023)

against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

23.    Defendant stores, maintains, and uses Plaintiff's and Class Members' Private Information.

24.    Defendant utilized the file transfer service, MOVEit, as a web transfer application to transfer documents. Defendant utilized the software with complete disregard for its data security and infrastructure.

25.    Defendant agreed to and undertook legal duties to maintain the Private Information of Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws. Defendant had obligations created by the FTC Act, HIPAA, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

26.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals... because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[6]

---

[6] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019),    https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

27.    In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[7]

28.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's clients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

29.    PII/PHI is a valuable property right.[8] The value of PII/PHI as a commodity is measurable.[9] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[10] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[11] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-

---

[7] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Sept. 26, 2023).

[8] *See* Marc Van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . .").

[9] Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle./824192.

[10] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[11] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

market," or the "dark web," for many years.

30.     As a result of their real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

31.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals." [12] As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70." [13] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1. [14]

---

[12] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAGAZINE (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[13] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[14] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited Sept. 26, 2023).

32.    According to Experian:

Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[15]

33.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[16]

---

[15] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[16] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited Sept. 26, 2023).

34.     Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

35.     Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites." [17]

36.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

37.     Based on the value of its clients' PII and PHI to cybercriminals and cybercriminals' propensity to target healthcare providers, Radius certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

---

[17] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Information Systems Research 254 (June 2011), https://www.guanotronic.com/~serge/papers/weis07.pdf.

C.    **Defendant Breached its Duty to Protect its Clients PII and PHI.**

38.    Defendant became aware of a security incident disrupting access to its systems on June 1, 2023.[18]

39.    According to Radius, it immediately began its own investigation into the potential impact of the Data Breach.[19]

40.    After determining some documents were accessed, the investigation confirmed that data containing PII and PHI may have been accessed or acquired by an unauthorized third party.[20]

41.    After the investigation revealed that PII and PHI may have been accessed or acquired by an unauthorized third party, Radius then conducted a review process to confirm what it already knew—that PII and PHI of current and former clients had been compromised.[21] This review process took an additional two months and was completed with efforts to get notices out to impacted individuals on August 4, 2023.[22]

42.    The patient PII and PHI compromised in the Data Breach includes patient names, dates of birth, Social Security Numbers, driver's license or state ID numbers, financial account and/or payment information, medical information, and health insurance information.[23]

---

[18] *Notice of MoveIt Data Event, supra.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

43.     On or about September 1, 2023, Radius reported the Data Breach to the Maine Attorney General, that they provided notice to Plaintiff indicating that their PII and PHI may have been compromised or accessed during the Data Breach, over two months after Radius first discovered the Data Breach.[24]

44.     Like Plaintiff, the Class Members received similar notices informing them that their PII and/or PHI was exposed in the Data Breach.

45.     All in all, 600,794 individuals had their PII and/or PHI breached.[25]

46.     The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures in order to protect its clients' PII and PHI.

47.     Plaintiff and Class Members have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

   a.  Trespass, damage to, and theft of their personal property including PII/PHI;

   b.  Improper disclosure of their Private Information;

   c.  The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

---

[24]     Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/289ddafe-e04b-426d-b4f8-8e742ff69e1e.shtml
[25]  U.S. Department of Health and Human Services Office for Civil Rights, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Sept. 26, 2023).

d. Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cyber criminals have their Private Information and that identity thieves may use that information to defraud other victims of the Data Breach;

e. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach; and

f. Ascertainable losses in the form of deprivation of the value of Plaintiff's and Class Members' personal information for which there is a well-established and quantifiable national and international market.

**D.      Radius is Obligated Under HIPAA to Safeguard Personal Information**

48.      Radius is required by the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1302d, et seq. ("HIPAA") to safeguard patient PHI.

49.      Radius is an entity covered by under HIPAA, which sets minimum federal standards for privacy and security of PHI. As a covered entity, Defendant has a statutory duty under HIPAA to safeguard Plaintiff's and Class Members' PHI.

50.      HIPAA establishes national standards for the protection of PHI. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. This includes compliance with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E (Standards for Privacy of Individually Identifiable Health Information"), and the Security Rule ("Security Standards for the Protection of

Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

51.    Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

52.    Under C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

53.    HIPAA requires Radius to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 CFR § 164.102, et. seq.

54.    HIPAA also requires Radius to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate

protection of electronic protected health information" under C.F.R. § 164.306(e), and to "[i]implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rules." 45 C.F.R. § 164.312(a)(1).

55.    Further, the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."26

56.    While HIPAA permits the disclosure of PHI to third parties under certain circumstances, HIPAA does not permit disclosures of PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

57.    As such, Radius is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it requires, receives, and collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

58.    Given the application of HIPAA to Radius, and that Plaintiff and Class Members entrusted their PHI to Defendant in order to receive their services, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

---

26 *Breach Notification Rule*, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

**E.    FTC Guidelines Prohibit Radius from Engaging in Unfair or Deceptive Acts or Practices.**

59.    Radius is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

60.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[27]

61.    The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[28]

62.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for

---

[27] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[28] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personalinformationpdf.

suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[29]

63.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

64.    Radius failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

65.    Radius was at all times fully aware of its obligations to protect the PII and PHI of its clients, which gave it direct access to reams of patient PII and PHI. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F.    Cyberattacks and Data Breaches Cause Disruption and Put Consumers at an Increased Risk of Fraud and Identity Theft.**

66.    Cyberattacks and data breaches at companies like Radius are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

67.    The United States Government Accountability Office released a report in

---

[29] *Id.*

2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[30]

68.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

69.     Theft of PII/PHI is serious. The FTC warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, open new utility

---

[30] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007), https://www.gao.gov/new.items/d07737.pdf.

accounts, and incur charges and credit in a person's name.

70.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing freezes on their credit, and correcting their credit reports.[31]

71.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

72.    Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

---

[31] *See IdentityTheft.gov*, Federal Trade Commission, https://www.identitytheft.gov/Steps (last accessed Feb. 24, 2023).

73.     Moreover, theft of PII/PHI is also gravely serious because PII/PHI is an extremely valuable property right.[32]

74.     Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[33]

75.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

76.     Each year, identity theft causes tens of billions of dollars of losses to victims in the United States. For example, with the PII/PHI stolen in the Data Breach, which includes Social Security numbers, identity thieves can open financial accounts, commit medical fraud, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police

---

[32] *See, e.g.*, John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[33] *See* Federal Trade Commission, *Medical Identity Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Sept. 26, 2023).

during arrests, and many other harmful forms of identity theft. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

77.    As discussed above, PII/PHI is such a valuable commodity to identity thieves, and once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

78.    Social security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> **Social Security number:** *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refund, employment—even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your lift in so many ways. [34]

79.    For instance, with a stolen Social Security number, which is only one subset of the PII compromised in the Data Breach, someone can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[35]

80.    The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[36] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file

---

[34] *See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number* (Nov. 2, 2017), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (emphasis added).
[35] *Id.*
[36] *Id.*

for unemployment benefits, or apply for a job using a false identity.[37] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

81.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[38]

82.    This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like Radius is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

---

[37] *Id.* at 4.
[38] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

83.    Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[39] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[40]

84.    The medical information, PHI, which was exposed is also highly valuable. PHI can sell for as much as $363 according to the Infosec Institute.[41]

85.    These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PII, they *will use it*.[42]

86.     "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum.[43] "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[44]

87.    Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives

---

[39] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

[40] *Dark Web Monitoring: What You Should Know*, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.

[41] Center for Internet Security, *Data Breaches: In the Healthcare Sector*,: https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Sept. 26, 2023).

[42] *Id.*

[43] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News, (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.

[44] *Id.*

for years."[45] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[46] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [47] The FTC also warns, "If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[48]

88.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

- Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought nor received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

---

[45] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIVACY FORUM 6 (Dec. 12, 2017), https://www.worldprivacyforum.org/2017/12/new-report-the-geography-of-medical-identity-theft/.
[46] *FBI Cyber Division Bulletin: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions* (May 6, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions.
[47] *What to Know About Medical Identity Theft*, Federal Trade Commission, https://consumer.ftc.gov/sites/default/files/articles/pdf/973a-medical-idtheft-what-to-know-what-to-do-508_0.pdf.
[48] *Id.*

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[49]

89.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

90.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[50]

---

[49] *FTC Informational Injury Workshop*, (October 2018), https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf.
[50] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 JOURNAL OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

91.     Cybercriminals can post stolen PII/PHI on the cyber black-market for years following a data breach, thereby making such information publicly available.

92.     Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened. [51] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names. [52]

93.     Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future. [53]

94.     It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

95.     A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information.

---

[51] *See* Medical ID Theft Checklist, https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited Sept. 26, 2023).
[52] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages")*, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Sept. 26, 2023).
[53] *Guide for Assisting Identity Theft Victims*, Fed. Trade Comm'n, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.



96.    Victims of the Data Breach, like Plaintiff and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[54]

97.    As a direct and proximate result of the Data Breach, Plaintiff and Class Members have had their PII/PHI exposed, have suffered harm as a result, and have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiff and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial

---

[54] *Id.*

accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

98.    Moreover, Plaintiff and Class Members have an interest in ensuring that their PII/PHI, which remains in the possession of Radius, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Radius has shown itself to be wholly incapable of protecting Plaintiff's and Class Members' PII/PHI.

99.    Plaintiff and Class Members also have an interest in ensuring that their personal information that was provided to Radius is removed from Defendant's unencrypted files.

100.    Radius acknowledged, in its letter to Plaintiff and Class Members, that, in response to the Data Breach, Radius "We continue to implement necessary patching and measures to secure the MOVEit database as we learn new information."[55]

101.    Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries. For this reason, Radius knew or should have known about these dangers and strengthened its data security accordingly. Radius was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

---

[55] *See Notice of Data Security Event*, *supra*.

## G.     Plaintiff and Class Members Suffered Damages

102.   Radius received Plaintiff's PII/PHI in connection with providing certain business services to them. In requesting and maintaining Plaintiff's PII/PHI for business purposes, Radius expressly and impliedly promised, and undertook a duty, to act reasonably in its handling of Plaintiff's PII/PHI. Radius did not, however, take proper care of Plaintiff's PII/PHI, leading to its exposure to and exfiltration by cybercriminals as a direct result of Defendant's inadequate security measures.

103.   For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them. Plaintiff have taken or will be forced to take these measures in order to mitigate their potential damages as a result of the Data Breach.

104.   Once PII and PHI is exposed, there is little that can be done to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

105.    Further, the value of Plaintiff and Class Members' PII and PHI has been diminished by its exposure in the Data Breach. Plaintiff and Class Members did not receive the full benefit of their bargain when paying for medical services, and instead received services that were of a diminished value to those described in their agreements with Radius for the benefit and protection of Plaintiff and Class Members and their respective PII/PHI. Plaintiff and Class Members were damaged in an amount at least equal to the difference in the value between the services they thought they paid for (which would have included adequate data security protection) and the services they actually received.

106.    Plaintiff and Class Members would not have obtained services from Radius, or paid the amount they did to receive such, had they known that Radius would negligently fail to adequately protect their PII/PHI. Indeed, Plaintiff paid for services with the expectation that Radius would keep their PII/PHI secure and inaccessible from unauthorized parties. Plaintiff and Class Members would not have obtained services from Radius had they known that Defendant failed to properly train its employees, lacked safety controls over its computer network, and did not have proper data security practices to safeguard their PII/PHI from criminal theft and misuse.

107.    As a result of Defendant's failures, Plaintiff and Class Members are also at substantial and certainly impending increased risk of suffering identity theft and fraud or misuse of their PII and PHI.

108.    Further, because Defendant delayed in notifying Plaintiff and the Class about the Data Breach for over two months, Plaintiff was unable to take affirmative steps during

that time period to attempt to mitigate any harm or take prophylactic steps to protect against injury.

109.    From a recent study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[56]

110.    With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[57] Indeed, in 2013 alone, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States," which is more than identity thefts involving banking, finance, the government and the military, or education.[58]

111.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[59]

---

[56] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited Sept. 26, 2023).
[57] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HealthITSecurity (Sept. 25, 2019) https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[58] Michael Ollove, *supra* note 68.
[59] David, *supra* note 82.

112.    The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[60]

113.    Health information in particular is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[61]

114.    A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[62] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve their identity theft at all.[63]

115.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[64]

---

[60] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[61] *Id.*

[62] Elinor Mills, *Study: Medical Identity Theft is Costly for Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[63] *Id.*; *see also* Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (Mar. 31, 2023), /www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[64] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

116.    Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's computer systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its clients PII and PHI.

117.    In addition, Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

**H.    Plaintiff's Experiences.**

118.    Plaintiff French received a data breach notice from Defendant dated September 9, 2023 informing her that "some of your information was present in the files accessible to the unauthorized actors" ant that her PII/PHI she provided to Radius had been compromised during the Data Breach. Specifically, Radius informed Plaintiff French that her Social Security number and other information had been compromised during the Data Breach.

119.    On or around September 18, 2023, Plaintiff French received an alert indicating that an unauthorized party had attempted to open a line of credit using Plaintiff French's PII, which adversely impacted her credit score.

120.    Plaintiff French takes great care to protect her PII/PHI. She was not aware that Radius had gained access to her PII/PHI, and would not have entrusted her PII/PHI with Radius or agreed to provide Radius with her PII/PHI. As a direct result of the Data Breach, Plaintiff French has suffered injury and damages including, *inter alia*, a substantial

and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; and deprivation of the value of her PII/PHI.

121.    She has also spent significant time monitoring her accounts for fraudulent activity, and will need to do so for the foreseeable future. Plaintiff French plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her accounts for any unauthorized activity.

## **CLASS ALLEGATIONS**

122.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of a Class as defined below

> All individuals whose PII and/or PHI was compromised in the Radius Data Breach, which was announced on or about August 4, 2023 (the "Class").

123.    Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

124.    This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when they move for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

125.    **Numerosity:** The Class Members are so numerous that individual joinder of all Class Members is impracticable. Radius estimates that approximately 600,794 individuals were affected by the Data Breach. All Class Members' names and addresses are

available from Radius' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

126.    **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a.  Whether Defendant failed to timely notify Plaintiff and Class Members of the Data Breach;

b.  Whether Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

c.  Whether Defendant was negligent in collecting and storing Plaintiff and Class Members' PII and PHI, and breached its duties thereby;

d.  Whether Defendant breached its fiduciary duty to Plaintiff and the Class;

e.  Whether Defendant breached its duty of confidence to Plaintiff and the Class;

f.  Whether Defendant entered a contract implied in fact with Plaintiff and the Class;

g.  Whether Defendant breached that contract by failing to adequately safeguard Plaintiff's and Class Members' PII and PHI;

h.  Whether Defendant was unjustly enriched;

i.  Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

j.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

127. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class were all clients of Defendant, each having their PII and PHI exposed and/or accessed by an unauthorized third party.

128. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members. Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

129. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class Member suffered damages by that conduct.

130. **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available

methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporations, like Radius. Even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

131.    Finally, all members of the proposed Class are readily ascertainable. Defendant had access to Class Members' names and addresses affected by the Data Breach. At least some Class Members have already been preliminarily identified and sent notice of the Data Breach.

132.    Unless a class-wide injunction is issued, Radius may continue to maintain inadequate security with respect to the PII and PHI of Class Members, Radius may continue to refuse to provide proper and adequate notice to Class Members regarding the Data Breach, and Radius may continue to act unlawfully.

<u>**FIRST CAUSE OF ACTION**</u>
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

133.    Plaintiff restates and realleges the preceding allegations of the paragraphs above as if fully alleged herein.

134.    Plaintiff brings this claim individually and on behalf of the Class.

135.   Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in safeguarding and protecting their PII and PHI in its possession, custody, and control.

136.   Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

137.   Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By collecting and storing valuable PII and PHI that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

138.   Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed. Defendant had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that information. Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between the Defendant and the Plaintiff and Class Members.

139.   Defendant were aware of the fact that cyber criminals routinely target corporations through cyberattacks in an attempt to steal the Private Information of employees, applicants, business associates, customers, and patients.

140. Defendant breached the duties owed to Plaintiff and Class Members and thus were negligent. As a result of a successful attack directed towards Defendant that compromised Plaintiff's and Class Members' PII and PHI, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur:

(a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its consumers; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

141. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

142. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including, but not limited to:

a.  Theft of their PII and/or PHI;

b.  Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

c.  Costs associated with purchasing credit monitoring and identity theft protection services;

d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.  Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches

so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.    Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

143.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

144.    Plaintiff restates and realleges the preceding allegations of the paragraphs above as if fully alleged herein.

145.    Plaintiff brings this claim individually and on behalf of the Class.

146.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant for failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

147.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and

PHI it obtained and stored and the foreseeable consequences of a data breach involving PII and PHI of its clients.

148. Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

149. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

150. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et. seq.*, and its implementing regulations, Defendant had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

151. Specifically, HIPAA required Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

152. Defendant violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI and by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI.

153. Plaintiff and the Class Members are consumers within the class of persons HIPAA was intended to protect.

154. Defendant's violation of HIPAA constitutes negligence *per se*.

155.   The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act and HIPAA was intended to guard against.

156.   As a direct and proximate result of Defendant's negligence, Plaintiff's and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and The Class)

157.   Plaintiff restates and realleges the preceding allegations of the paragraphs above as if fully alleged herein.

158.   Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

159.   As a recipient of their consumers' PII and PHI, Defendant has a fiduciary relationship to its clients, including Plaintiff and the Class Members. At a minimum, that duty extended to taking reasonable steps to safeguard the data entrusted to it.

160.   Because of that fiduciary relationship, Defendant was provided with and stored private and valuable PHI and PII related to Plaintiff and the Class. Plaintiff and the Class were entitled to expect their information would remain confidential while in Defendant's possession.

161.   Defendant owed a fiduciary duty under common law to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding,

deleting, and protecting their PII and PHI in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

162.    As a result of the parties' fiduciary relationship, Defendant had an obligation to maintain the confidentiality of the information within Plaintiff's and the Class Members' medical records.

163.    Defendant's clients, including Plaintiff and Class Members, have a privacy interest in PHI/PII, and Radius had a fiduciary duty not to disclose data concerning its clients.

164.    As a result of the parties' relationship, Defendant had possession and knowledge of confidential PII and PHI of Plaintiff and Class Members, information not generally known.

165.    Plaintiff and Class Members did not consent to nor authorize Defendant to release or disclose their PII and PHI to unknown criminal actors.

166.    Defendant breached its fiduciary duties owed to Plaintiff and Class Members by, among other things:

   a.    Mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI;

   b.    Mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

c.  Failing to design and implement information safeguards to control these risks;

d.  Failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

e.  Failing to evaluate and adjust its information security program in light of the circumstances alleged herein;

f.  Failing to detect the breach at the time it began or within a reasonable time thereafter;

g.  Failing to follow its own privacy policies and practices published to its clients; and

h.  Failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

167.    But for Defendant's wrongful breach of its fiduciary duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

168.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

a.  Theft of their PII and/or PHI;

b.  Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

c.  Costs associated with purchasing credit monitoring and identity theft protection services;

d.   Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.   The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.   Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h.   Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i.   Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime

opportunities to commit identity theft, fraud, and other types of attacks on

Plaintiff and Class Members.

169. As a direct and proximate result of Defendant's breach of its fiduciary duties,

Plaintiff and Class Members are entitled to damages, including compensatory, punitive,

and/or nominal damages, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and The Class)**

170. Plaintiff restates and realleges the preceding allegations of the paragraphs

above as if fully alleged herein.

171. Plaintiff brings this claim individually and on behalf of the Class.

172. Upon information and belief, Defendant funds its data security measures

entirely from its general revenue, including payments made by or on behalf of Plaintiff and

the Class Members.

173. As such, a portion of the payments made by or on behalf of Plaintiff and the

Class Members is to be used to provide a reasonable level of data security, and the amount

of the portion of each payment made that is allocated to data security is known to

Defendant.

174. Plaintiff and Class Members conferred a monetary benefit on Defendant.

Specifically, they purchased business services from Defendant and/or its agents and in so

doing, provided Defendant with their PII and PHI. In exchange, Plaintiff and Class

Members should have received from Defendant the goods and services that were the

subject of the transaction and have their PII and PHI protected with adequate data security.

175.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII and PHI of Plaintiff and Class Members for business purposes.

176.    In particular, Defendant enriched themselves by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

177.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

178.    Defendant failed to secure Plaintiff's and Class Members' PII and PHI and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

179.    Defendant acquired the PII and PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

180.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their PII and PHI, they would not have agreed to provide their PII and PHI to Defendant.

181.    Plaintiff and Class Members have no adequate remedy at law.

182.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injuries, including, but not limited to:

a.  Theft of their PII and/or PHI;

b.  Costs associated with purchasing credit monitoring and identity theft protection services;

c.  Costs associated with the detection and prevention of identity theft and unauthorized use of their PII and PHI;

d.  Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g.  Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant

would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

183. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

184. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

<u>**FIFTH CAUSE OF ACTION**</u>
**BREACH OF CONTRACTS TO WHICH PLAINTIFFS AND CLASS MEMBERS ARE INTENDED THIRD PARTY BENEFICIARIES**
**(On Behalf of Plaintiff and The Class)**

185. Plaintiff restates and realleges the preceding allegations of the paragraphs above as if fully alleged herein.

186.    Radius has one or more contracts with MoveIT regarding the web transfer application(s) on which the PII and PHI of Plaintiffs and Class Members were stored.

187.    Radius also has contracts with the various businesses on whose behalf it provides customer engagement and technology services.

188.    Both sets of these agreements have, upon information and belief, confidentiality provisions that are for the direct benefit of Plaintiffs and Class Members.

189.    Radius breached these contractual confidentiality provisions by failing to reasonably protect the sensitive information entrusted to it.

190.    This breach caused damages directly to Plaintiff and Class Members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief as follows:

    a.  For an order certifying the Class as defined herein, and appointing Plaintiff and her counsel to represent the Class;

    b.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

    c.  For damages in an amount to be determined by the trier of fact;

    d.  For an order of restitution and all other forms of equitable monetary relief;

    e.  Declaratory and injunctive relief as described herein;

    f.  Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

    g.  Awarding pre- and post-judgment interest on any amounts awarded; and

    h.  Awarding such other and further relief as may be just and proper.

## **JURY TRIAL DEMANDED**

A jury trial is demanded by Plaintiff on all claims so triable.

Respectfully submitted,

Dated: September 27, 2023

*/s/ Brian C. Gudmundson*
Brian C. Gudmundson (MN Lic. #336695)
Michael J. Laird (MN Lic. #398436)
Rachel K. Tack (MN Lic. #399529)
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
rachel.tack@zimmreed.com

Jonathan Shub
(*pro hac vice* forthcoming)
Benjamin F. Johns
(*pro hac vice* forthcoming)
Samantha E. Holbrook
(*pro hac vice* forthcoming)
**SHUB & JOHNS LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
jshub@shublawyers.com
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Attorneys for Plaintiff and the Putative Class*